**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. NO. 08-20S** |
| | ) | |
| **LUIS M. SANCHEZ** | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS**

The government respectfully urges the Court to deny the defendant's motion to suppress evidence seized from 3 Flora Street, 2nd Floor, Providence, Rhode Island on December 7, 2007. The evidence was seized pursuant to a valid search warrant supported by probable cause. In the alternative, the government asks that the Court find that the federal and state officers executing the search warrant at 3 Flora Street, 2nd Floor were acting in good faith. Lastly, to the extent the defendant seeks to suppress the crack cocaine, which he discarded in the common area of a multi-unit, apartment building, the Court should deny the defendant's motion because he has not established a reasonable expectation of privacy in the common areas of 3 Flora Street, Providence, Rhode Island.

## I. FACTS

On December 7, 2007, Detective Dennis Smith, a detective with the Pawtucket Police Department and a task force agent with the U.S. Drug Enforcement Administration Task Force, sought and obtained search warrants for several vehicles and locations in

Rhode Island, including 3 Flora Street, 2nd Floor, Providence, Rhode Island. A copy of the warrant for 3 Flora Street, 2nd Floor is attached to this response as Exhibit 1.

After Detective Smith obtained these warrants, Special Agent Jamie Schiffer with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and various detectives with the Providence Police Department executed the warrants for 3 Flora Street, 2nd Floor, Providence, Rhode Island, and the Dodge Durango, RI Registration 756-416.

Prior to the execution of the warrant, Luis M. Sanchez was observed exiting the Dodge Durango, RI Registration 756-416, and entering 3 Flora Street. Shortly thereafter, the officers entered the common hallway of 3 Flora Street and observed Sanchez exit the 2nd Floor apartment. Sanchez was ordered to place his hands on his head. Instead, Sanchez reached into his pocket and removed a plastic bag of crack cocaine which he threw to the floor. The crack cocaine was analyzed at the laboratory where it was determined to contain cocaine base and weigh 6.78 grams.

During the execution of the warrant at 3 Flora Street, 2nd Floor, officers seized a digital gram scale and a sifter from the kitchen. Next to the scale were 16.21 grams of crack cocaine. The crack cocaine was analyzed at the laboratory and

determined to contain cocaine base. In a bedroom, officers located paperwork in the name of Luis Sanchez, including a social security card and a birth certificate. In another bedroom, on top of a television, detectives located two digital scales and numerous plastic bags. Sanchez's fingerprints were recovered from these scales. In that same bedroom, detectives found a large, black, duffel bag. Inside the duffel bag, detectives found a Glock gun case containing a Glock, Model 19, 9mm, semi-automatic pistol, serial number EYM235, and two loaded magazines. One of the magazines was inside the pistol. Paperwork in the name of Luis Sanchez, including a United States passport, was also found inside the duffel bag.

While searching Sanchez's person, officers seized a cellular phone, a wallet, $202, and the keys to the Dodge Durango, RI Registration 756-416. While searching the Durango, officers found a hidden compartment, like those commonly used to transport narcotics, under the rear seat of the car.

The defendant has filed a motion seeking to suppress the evidence seized from the defendant's person, the common hallway of 3 Flora Street, and the 2nd Floor apartment. For the reasons set forth below, the defendant's motion should be denied.

## II. PROBABLE CAUSE

To satisfy the requirements of the Fourth Amendment, a search warrant application must "demonstrate probable cause to believe that a particular person has committed a crime-"the commission element"-and that enumerated evidence relevant to the probable criminality likely is located at the place to be searched-"the nexus element". United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996); see United States v. Woodbury, 511 F.3d 93, 97 (1st Cir. 2007). Probable cause does not require any showing that the affiant's belief that evidence will be found in the searched premises "'be correct or more likely true than false.'" United States v. Grant, 218 F.3d 72, 75 (1st Cir. 2000) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). "The criterion . . . is whether the facts presented in the affidavit would 'warrant a man of reasonable caution' to believe that evidence of crime will be found." United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)).

"Where an affidavit relies on the reports of unnamed informants, it must provide some information upon which the issuing justice can assess the credibility of the informant's information." United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002). That assessment should be based upon the

consideration of several factors, including the probable veracity of the informant, the informant's basis of knowledge, whether the informant's statements were self-authenticating, the existence of any corroboration, and whether the law enforcement affiant included a professional assessment of the probable significance of the facts based on experience or expertise. See id. at 93. "None of the factors is indispensable; thus, stronger evidence on one or more factors may compensate for a weaker or deficient show on another." Id. (quoting Zayas-Diaz, 95 F.3d at 111).

In reviewing a magistrate's decision to issue a search warrant, the Court's "inquiry is whether the magistrate had a 'substantial basis' for concluding that probable cause existed." Feliz, 182 F.3d at 86. The Court must "accord 'considerable deference' to the 'probable cause' determination made by the issuing magistrate." Zayas-Diaz, 95 F.3d at 111. This requires a "practical, commonsense" assessment of the magistrate's probable cause finding. Illinois v. Gates, 462 U.S. 213, 238 (1983); see United States v. Taylor, 985 F.2d 3, 4 (1st Cir. 1993).

When assessing probable cause, a reviewing court should recognize the fact that warrants are drafted by "nonlawyers in the midst and haste of criminal investigations." Gates, 462

U.S. at 235. Accordingly, the Supreme Court has established a nontechnical approach that affords considerable deference to the magistrate and focuses upon a totality of the circumstances, with an emphasis on flexibility and common sense. Id. at 238-41. For example, in Gates, 462 U.S. at 246, the police obtained a warrant based upon an anonymous letter which alleged that the defendants were engaged in selling drugs. Id. at 225-27. The letter described a trip to Florida the defendants would be taking to obtain drugs. Id. The police corroborated the tip by ascertaining the defendants' address and then conducting surveillance while one of the defendants travelled to Florida. Id. Based upon these facts, the police obtained a warrant, which they executed upon the defendants' return to their home. Id. Using a totality of circumstances approach, the Supreme Court determined that the search warrant affidavit established probable cause to search the defendants' home and car.

In Zayas-Diaz, 95 F.3d at 108-111, the DEA obtained a warrant to search 16 Holbrook Road, Bedford, New Hampshire, based upon one informant's statement that the defendant sold cocaine approximately two months prior to the search; an arrestee's statement that the defendant sold cocaine two months prior to the search; and, a second informant's statement that the defendant lived in Bedford and that he had seen large

amounts of cocaine at the defendant's residence. The affiant had attempted to verify the second informant's information regarding the defendant's residence by conducting aerial surveillance and by ascertaining that an individual believed to be dating the defendant occupied 16 Holbrook Street. The defendant moved for suppression arguing that the second informant did not explicitly identify 16 Holbrook as the defendant's address and that his description of the premises differed in some respects from the information obtained through the aerial surveillance. Recognizing the deferential standard of review afforded the magistrate's probable cause determination, see id. at 111, the First Circuit agreed with the district court that the search warrant affidavit contained adequate support for the magistrate's "practical, common-sense 'probable cause' determination" that the defendant resided or conducted drug operations at 16 Holbrook Road in the past.[1]

**A. THE COMMISSION ELEMENT**

The first task before the Court is to assess whether the warrant set forth sufficient facts for Magistrate Judge Joseph Ippolito, Sixth Division of the District Court of Rhode Island,

[1] In addressing the defendant's staleness claim, the district court bypassed the probable cause issue and went directly to the Leon good faith exception. The First Circuit affirmed this approach and concluded that the executing officers were objectively reasonable in believing that there was a fair probability that drug trafficking records would be found at 16 Holbrook Road.

to conclude that Luis M. Sanchez, Luis Droz, Abimalet Droz, and Rafael Guzman committed a crime. Although there is no question that the affidavit could be drafted more clearly, a careful reading of it demonstrates that the above-mentioned individuals engaged in a conspiracy to distribute cocaine during 2007. This information was supplied by several confidential sources, and corroborated by Detective Smith's own investigation, an investigation in the District of Connecticut, and an investigation in the District of Maine.

According to the affidavit, during 2007, more than one confidential source provided information to law enforcement regarding a cocaine conspiracy that was headed by Luis Droz, and included Luis M. Sanchez, Abimalet Droz, and Rafael Guzman. These sources provided information regarding how the organization transported its narcotics in a fleet of Dodge Durangos equipped with hidden compartments. The sources specifically identified Rafael Guzman as the member, who at the direction of Droz, travelled to New York every two weeks for cocaine. According to the affidavit, more than one confidential source stated that the organization operated stash houses in the area, specifically identifying one stash house at 36 Sterry Street and another in the city of Providence.

In evaluating the credibility of an informant, the courts "first assess the manner in which the informant provided the tip." United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005). According to the affidavit, Detective Smith received information from confidential sources, one of whom was used to purchase cocaine from Guzman and Droz. That is, the sources were known to law enforcement as opposed to being anonymous tipsters. Such "face-to-face contact between the agent and informant supports the informant's reliability." Id. Although there is no statement in the affidavit that Detective Smith knew the sources to be reliable, "an informant's tip can establish probable cause even though the affidavit does not contain information about the informant's past reliability." Id.

The information from the confidential sources was specific and detailed regarding the operation of the Droz drug trafficking organization. In particular, the statements regarding the transportation of narcotics in hidden compartments of Dodge Durangos and the information regarding the trips to New York City for cocaine, demonstrated the close relationship between the sources and the targets. This would not be the type of information known to a large number of people, especially since the affidavit indicated that Droz was "extremely watchful

of law enforcement." Thus, the nature of this information added to its reliability.

Significantly, the sources' information regarding the individuals' criminal activity, or "commission element," was corroborated by the information supplied by the other districts. Specifically, in January and February 2007, 10 to 11 months before the execution of the warrant at 3 Flora Street, 2nd Floor, the DEA intercepted telephone conversations between Luis Droz and the Connecticut targets. During these conversations, Droz engaged in negotiations regarding the purchase of multiple kilograms of cocaine and the sale of one kilogram of heroin. The Connecticut investigation resulted in multiple arrests. According to the affidavit, Droz fled the jurisdiction for three months. Approximately three months after his return, in September 2007, the DEA in Maine stopped a Dodge Durango, resulting in the seizure of two kilograms of crack cocaine. The Durango was released to Rafael Guzman, and was used by members of the Droz conspiracy. A confidential source in Maine identified Guzman as the main runner for Droz.

Detective Smith, the affiant and an experienced narcotics detective, was also able to verify the sources' information through his own investigation. "[I]nformation and surveillance" identified the residences of the conspirators and the vehicles

they used, several of which were Dodge Durangos. Surveillance also corroborated and identified the stash house location, which according to the sources was initially located at 36 Sterry Street, Pawtucket, RI. This information was further corroborated by the reported home invasion involving the demand for cocaine. After the home invasion, a source stated that the stash house was moved to Providence. The investigation then identified the new stash house location as 3 Flora Street, 2nd Floor, Providence, RI, which surveillance corroborated when it observed the conspirators, including Sanchez, arrive at the stash house during the day and night and remain only for short periods of time.[2]

In the month preceding the execution of the search warrant, Detective Smith, through the aid of a confidential source, was able to purchase a quantity of cocaine from Guzman via Droz, further corroborating the information received from the sources. Detective Smith also corroborated the sources' information regarding the New York supply connection when he determined that a Dodge Durango left from Guzman's apartment for New York City the morning of December 7, 2007, stayed in New York City for approximately 90 minutes, and was returning at the time the

[2] Such activity suggests narcotics trafficking. Although Detective Smith does not specifically identify this activity as behavior consistent with narcotics trafficking, the magistrate is allowed to use his common sense when evaluating the facts in the affidavit. See Woodbury, 511 F.3d at 97.

warrant was signed. Both of these events corroborated the information received regarding the criminal activity of Luis Droz, Rafael Guzman, Luis M. Sanchez and Abimalet Droz.

The criminal history of Luis Droz and Luis M. Sanchez included in the affidavit further supports the conclusion that these individuals were engaged in narcotics trafficking. According to the affidavit, both Droz and Sanchez were arrested in Central Falls, RI for possession of heroin with the intent to deliver on April 11, 2002. This suggested a drug connection between these two individuals.[3] See Barnard, 299 F.3d at 95 (criminal background check provided further corroboration); Taylor, 985 F.2d at 6 ("prior criminal activity or record clearly is material to the probable cause determination").

Considering the information from the confidential sources and the corroboration provided by other investigations and Detective Smith's own investigation, there is probable cause to believe that Luis Droz, Luis M. Sanchez, Rafael Guzman, and Abimalet Droz committed various narcotics violations during 2007, up to and including on December 7, 2007.

---

[3] Although not explicitly stated in the affidavit, the criminal information associated with these drug offenses indicates that Luis Droz and Luis Sanchez were charged together in the same information alleging possession of heroin with the intent to deliver, possession of marijuana, and conspiracy to possess heroin with the intent to deliver.

**B. THE NEXUS ELEMENT**

After assessing whether the affidavit provided probable cause to believe that a crime had been committed, the Court must determine whether the affidavit contained sufficient facts for Magistrate Judge Ippolito to determine that evidence of narcotics offenses would be found at 3 Flora Street, 2nd Floor. That is, the Court must determine whether the facts in the affidavit would "'warrant a man of reasonable caution' to believe that evidence of crime will be found." Woodbury, 511 F.3d at 98 (finding a sufficient nexus based upon the informants' statements that at least part of the criminal activity occurred in the residence, and the common sense inference that a drug dealer's residence may contain evidence of drug possession).

In this case the warrant application identified Luis Droz, Luis M. Sanchez, Rafael Guzman, and Abimalet Droz as the "owner[s] or keeper[s]" of 3 Flora Street, 2nd Floor. The affidavit also specifically stated that Sanchez and Abimalet Droz resided at 3 Flora Street, 2nd Floor, and that all four individuals had been observed using the residence by surveillance. See United States v. Barnes, 492 F.3d 33, 37 (1st Cir. 2007) ("This court has repeatedly found, however, that when a defendant sells drugs outside his home, it is reasonable to

conclude that there is evidence of his drug dealing activity in the home. . . .”); Feliz, 182 F.3d at 87-88 (even without direct evidence, it is reasonable to suppose that a regular trafficker maintains records and other evidence at his residence).

Considering the totality of the circumstances, it was not unreasonable for Magistrate Ippolito to conclude that there was a fair probability that evidence of drug trafficking would be found at 3 Flora Street, 2nd Floor. The affidavit clearly established that 3 Flora Street was an address frequently used by Droz, Sanchez, Guzman, and Abimalet Droz, individuals believed to be engaged in narcotics trafficking. Additionally, in the affidavit, Detective Smith, a 10 year veteran of the Pawtucket Police Department, who has spent six years investigating narcotics cases, expressed his belief that there was probable cause to sustain a warrant for 3 Flora Street, 2nd Floor. Magistrate Ippolito is entitled to accord some weight to this opinion in light of Detective Smith’s experience. See Feliz, 182 F.3d at 87.

The affidavit also stated that a confidential source informed law enforcement that the Droz organization had moved their stash house into Providence, and that the investigation revealed that the new stash house was located at 3 Flora Street, 2nd Floor. This information was substantiated by surveillance,

which observed all four individuals arriving at 3 Flora Street, staying for a few minutes, and then leaving. It would be reasonable for Magistrate Ippolito, using his common sense, to suppose that repeated, brief stops at a residence are indicative of drug trafficking. This is especially true given the other information included in the affidavit regarding the drug conspiracy.

In addition, the affidavit stated that the Durango that had been stopped in Maine in September 2007 with two kilograms of crack cocaine, released to Rafael Guzman, and used by members of the Droz organization, was "frequently" parked at all times of the day and night at 3 Flora Street, Providence, RI. The presence of the Durango at 3 Flora Street, when considered with the other information in the affidavit, further supports Magistrate Ippolito's probable cause determination.

**C. STALENESS**

The affidavit described narcotics activities of the Droz organization over a period of 10 to 11 months prior to the execution of the search warrants on December 7, 2007. Based upon this, the defendant complains that the information regarding the Droz organization's use of 3 Flora Street was stale. Given the ongoing operations of the suspects, the defendant's argument is without merit.

"[C]ourts confronting suppression motions do not measure the timeliness of collected information mechanistically, merely counting the number of days elapsed." United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996). "Rather, a number of integers must be factored into the calculus-e.g., the nature of the information, the nature and characteristics of the supposed criminal activity, the nature and characteristics of the place to be searched, the nature of the items delineated in the warrant-and the likely endurance of the information must be gauged on that basis." Id.

In the case of drug conspiracies, the ongoing nature of their operations renders information timely that might in other contexts be considered stale. See United States v. Keene, 341 F.3d 78, 82 (1st Cir. 2003); United States v. Owens, 167 F.3d 739, 746 (1st Cir. 1999); Schaefer, 87 F.3d at 568. Courts have held information that is multiple months old, or even multiple years old, to be timely when it is corroborated by more recent information and it relates to an ongoing criminal enterprise. See, e.g., Keene, 341 F.3d at 82 (information provided over a 10 year period was not stale since it was corroborated and was consistent with a drug conspiracy of long duration); Feliz, 182 F.3d at 87 (three month old information was not stale);

Schaefer, 87 F.3d at 568 (information several years old was not stale).

In this case, the affidavit recited criminal history information that was five years old, information of wiretap inceptions that was 10 to 11 months old, information obtained from a traffic stop in Maine in that was three months old, information from confidential sources coming in over the course of the year, a controlled buy that occurred between November 1, 2007 and December 7, 2007, and information learned by surveillance activities over the past year, up to and including December 7, 2007. The affidavit also stated that Droz was out of the country for three months after the arrests in the Connecticut investigation. Given the nature of the criminal enterprise, namely an ongoing conspiracy, the information contained within the affidavit was not out-dated. Rather, each piece of information obtained over the 10 to 11 month period included in the affidavit described a different aspect of the organization and was corroborated by the more recent information becoming available.

**III. GOOD FAITH**

Even if the Court were to consider Detective Smith's affidavit defective, Special Agent Schiffer and the Providence Police detectives executing the warrant on Detective Smith's

behalf reasonably relied upon the warrant's validity. See United States v. Leon, 468 U.S. 897 (1984); see Woodbury, 511 F.3d at 99-100; United States v. Capozzi, 347 F.3d 327, 333-334 (1st Cir. 2003); United States v. Beckett, 321 F.3d 26, 31-33 (1st Cir. 2003); Zayas-Diaz, 95 F.3d at 113-16; United States v. Manning, 79 F.3d 212, 221 (1st Cir. 1996). In Leon the Supreme Court recognized that since the purpose of the exclusionary rule was to deter police misconduct, the suppression of evidence seized pursuant to a search warrant "should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Leon, 468 U.S. at 919. "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. . . . Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Leon, 468 U.S. at 921.

There are several exclusions to the Leon good faith exception, three of which the defendant attempts to avail himself of here. First, the defendant argues that the warrant was "so facially deficient-i.e. in failing to particularize the place to be searched or the things to be seized-that the

executing officers [could not] reasonably presume it to be valid." Owens, 167 F.3d at 745 (finding that officers executed the search warrant in good faith). Second, the defendant maintains that Detective Smith's affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. Finally, the defendant contends that the magistrate was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth. Id. The defendant also tries to incorporate a request for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) into his argument that Detective Smith misled the magistrate. Despite the defendant's arguments, the Court should find that SA Schiffer and the Providence Police detectives executing the warrant acted in good faith.

**A. FACIALLY DEFICIENT WARRANT AND AN AFFIDAVIT LACKING IN PROBABLE CAUSE**

In his motion, the defendant appears to merge these two exclusions to the Leon good faith exception since he did not point to a flaw in the warrant itself, but instead confined his arguments to attacking the probable cause contained in the affidavit. Specifically, the defendant contends that the affidavit failed to establish a nexus between the suspects and 3

Flora Street, 2nd Floor, and that the information contained within the affidavit was stale.

While the affiant, Detective Smith, could have more clearly explained how the investigation identified 3 Flora Street, 2nd Floor as the stash house, considering the totality of the circumstances, the affidavit established the nexus element sufficiently to pass muster under Leon. See Beckett, 321 F.3d at 32. As already discussed, the affidavit established that (1) a confidential source said that the organization's stash house was located in Providence; (2) that the investigation revealed that the stash house was located at 3 Flora Street, 2nd Floor; (3) that surveillance observed Droz, Abimalet Droz, Sanchez, and Guzman stop by 3 Flora Street for short periods of time; (4) that the Dodge Durango used to transport two kilograms of crack cocaine to Maine in September 2007 was later released to Droz's main runner, Guzman, and was frequently parked outside of 3 Flora Street at all times of the day and night; and (5) that Abimalet Droz and Luis Sanchez lived at 3 Flora Street, 2nd Floor. Given the facts described in Detective Smith's affidavit, SA Schiffer and the Providence Police detectives were not unreasonable in believing that Magistrate Ippolito issued a valid warrant supported by probable cause.

Regarding the defendant's staleness argument, as already discussed, this affidavit contained information regarding the Droz drug organization that was developed over the course of 10 to 11 months. The most recent information corroborating the existence of this drug conspiracy was learned on December 7, 2007, the date the warrant was sought. The warrant also stated that 3 Flora Street, 2nd Floor was the stash house used by the organization "now," after a burglary attempt on the previous stash house. Given the nature of a conspiracy described in the affidavit, the fact that 3 Flora Street was identified as the present stash house, and the evidence of the New York City drug run which was ongoing at the time the warrant was sought, SA Schiffer and the Providence Police detectives were objectively reasonable in believing that the warrant was valid. See Zayas-Diaz, 95 F.3d at 116 (recognizing that given the ongoing nature of a drug conspiracy, probable cause may continue for weeks if not months).

**B. MISLEADING INFORMATION IN THE AFFIDAVIT**

Using novel powers of interpretation, the defendant contends that the affidavit misled Magistrate Ippolito into believing that the officers intended to wait until the cocaine obtained from New York was dispersed before executing the warrants. As a result, the defendant argues that he is entitled

to a Franks hearing, and that the officers executing the warrant were not entitled to the good faith exception.

"[A] presumption of validity" exists "with respect to the affidavit supporting the search warrant." Franks v. Delaware, 438 U.S. 154, 171 (1978). Accordingly, a defendant is required to make a "substantial preliminary showing" that the affidavit contains a false or reckless statement prior to receiving a hearing regarding the validity of that affidavit. See id. at 155. The Supreme Court in Franks stated the following with respect to the defendant's burden of proof:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits of sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

Id. at 171-72.

The Supreme Court took great pains in the Franks case to make sure that lower courts did not interpret this ruling in a manner that would enable defendants to abuse such hearings. The Court pointed out that the truthful showing required by the Fourth Amendment,

> [D]oes not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.

Id. at 165.

To obtain a Franks hearing, the defendant must first make "a 'substantial preliminary showing' that (1) a false statement, (2) knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit, and (3) the allegedly false statement is necessary to the finding of probable cause." United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002) (citing Franks, 438 U.S. at 155-56). Conclusory allegations do not satisfy the defendant's burden. See United States v. Higgins, 995 F.2d 1, 4 (1st Cir. 1993).

The facts contained in the affidavit do not support the defendant's theory, nor has he made a "substantial preliminary showing" that supports his request for a Franks hearing. The defendant attempts to construe the warrant as an anticipatory warrant; however, nowhere in the affidavit did Detective Smith state that the officers intended to wait until the New York City load was distributed before executing the warrants, or even that he believed that the load was destined for 3 Flora Street that night. The defendant assumes, without any offer of proof, that

Magistrate Ippolito was misled into believing that this was an anticipatory warrant. Yet, when no statements to that effect were included in the affidavit, the defendant's assumptions fail to meet his burden under Franks. Likewise, the defendant's assumptions do not preclude the officers who executed the warrant from receiving the benefit of the good faith exception.

**IV. COMMON AREAS**

"It is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common area of an apartment building." United States v. Hawkins, 139 F.3d 29, 32 (1st Cir.), cert. denied, 525 U.S. 1029 (1998); see United States v. Paradis, 351 F.3d 21, 31 (1st Cir. 2003); United States v. Garner, 338 F.3d 78, 80 (2003); United States v. Brown, 169 F.3d 89, 92 (1st Cir. 1999); United States v. Cruz-Pagan, 537 F.2d 554, 557-58 (1st Cir. 1976). Despite this clear precedent, it does not appear as though the First Circuit has addressed the situation involving a locked apartment building door. However, at least four Circuit Courts of Appeals have and determined that it does not matter whether the door to the apartment building is locked or unlocked at the time law enforcement officers arrive. See United States v. Miravalles, 280 F.3d 1328, 1331-32 (11th Cir. 2002) (not deciding the issue for the Eleventh Circuit under the facts presented, but

nonetheless surveying cases from the Second, Seventh, Eighth, and Ninth Circuits which dealt with a locked apartment building door); see also United States v. Dillard, 438 F.3d 675, 683-84 (6th Cir. 2006) (holding that the defendant did not have a reasonable expectation of privacy in the common areas of his apartment building); but see United States v. Carriger, 541 F.2d 545, 550 (6th Cir. 1976) (recognizing a reasonable expectation of privacy in the common areas when the apartment building door is locked).

In this case, if the Court determines that the warrant lacks probable cause and that the officers executing the warrant did not act in good faith, the Court should nonetheless conclude that crack cocaine seized from the defendant's feet in the common area of the apartment building should not be suppressed. 3 Flora Street was a multi-family dwelling, containing three units. As evidenced by the affidavit, there was frequent foot traffic in and out of 3 Flora Street by Droz, Guzman, Sanchez, and Abimalet Droz. Assuming that all three units were rented by at least one individual, Sanchez shared the common hallway and stairs with at least five other individuals and this does not include guests of the other tenants. See United States v. Concepcion, 942 F.2d 1170, 1172 (7th Cir. 1991). In light of these facts, the Court should refuse to find that Sanchez had a

reasonable expectation of privacy in the common area of 3 Flora Street. The crack cocaine seized from that common area should not be suppressed. Furthermore, once the officers observed the defendant throw the crack cocaine to the floor, the subsequent search of the defendant's person was valid. Therefore, the keys, cellular phone, wallet and money were seized pursuant to a valid search incident to arrest.

## V. CONCLUSION

Based on the foregoing, the Court should find that the warrant for 3 Flora Street, 2nd Floor was supported by probable cause. In the alternative, the Court should find that the officers executing the warrant acted in good faith. The Court should also find that the defendant did not have a reasonable expectation of privacy in the common area of 3 Flora Street. The defendant's motion to suppress should be denied.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U.S. Attorney
New York Bar
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (fax)
sandra.beckner@usdoj.gov

**CERTIFICATION**

On April 29, 2008, I caused the within "Government's Response in Opposition to Defendant's Motion to Suppress" to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Mr. Terence E. Livingston
Attorney at Law
681 Smith Street
Providence, RI 02908
Tel: (401) 861-8121
Fax: (401) 274-5433
terry@livingstonlaw.us

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
sandra.beckner@usdoj